## Armstrong's Appeal.

5ws352
200 502

The revival of a judgment by agreement to which a terre-tenant is not a party, will not continue the lien as to him, although the deed by which he became terre-tenant was not recorded; and his judgment creditors may avail themselves of the objection.

One who becomes surety of a defendant in a judgment to entitle him to a stay of execution, and by reason of such liability afterwards pays the judgment, is not entitled to be substituted as plaintiff, and have priority to subsequent judgment creditors.

THIS was an appeal from the decree of the Court of Common Pleas of *Centre* county, appropriating the proceeds of the sale of the real estate of George S. Armstrong. On the 6th August 1831, Thomas Wilson obtained a judgment in the Common Pleas of Centre county against Clement Beckwith, whose only real estate in the county at that time was lot No. 114, which he had purchased at sheriff's sale on the 17th March 1827. On the 31st December 1831, Beckwith purchased of James Steele two lots of ground in Bellefonte, the deed for which was recorded on the 7th January 1832. On the 15th June 1836, Wilson obtained from Beckwith an amicable revival of his judgment, which continued the lien of it on No. 114, and created a lien on the two lots purchased of Steele. On the 21st January 1840, Beckwith purchased of James Harris lots numbered 69, 67, 65, 63 and 61, and recorded his deed the same day. On the 25th April 1840, he made articles of agreement with George S. Armstrong for the sale of all of the above-mentioned parcels of property, for the sum of $5899.99. Armstrong was a merchant at this time, and in pursuance of the articles of agreement, he delivered over to Beckwith his store of goods in part payment. They were valued and received at $4292.54, which left a balance due on the articles of $1607.45. It was agreed that if the store did not amount to as much as the property Armstrong was buying, he should have the balance of the purchase money to pay the liens against Beckwith. Beckwith having received the store of goods, made his deed to Armstrong for the real estate before mentioned, on the 22d July 1840, and received a mortgage of the premises of even date, for the balance due, $1607.45, which he caused to be recorded on the 24th September 1840. Armstrong did not record either his articles of agreement or his deed, and never went, personally, into the occupancy or possession of the premises. At the time of the contract between Beckwith and Armstrong, the former was occupying part of the premises in person, and several tenants were occupying other parts under him, and from that time till the 1st April 1842, (which was after the

sheriff's sale), Beckwith and the same tenants continued to occupy the premises as tenants of Armstrong.

On the 4th June 1841, Wilson obtained from Beckwith another amicable revival of his judgment, by a writing filed of record, without a *scire facias* or notice to Armstrong or to the occupiers of the premises. The amount of the judgment at the date of the last revival was $742.99. Wilson's right to receive the amount of his judgment out of the moneys raised by the sale of the two lots, or of lot No. 114, was resisted on two grounds : 1. That the lien of his judgment continued and created by the revival of 15th June 1836, had expired before the date of the sheriff's sale, (29th January 1842), and the revival of the 4th June 1841 did not continue the lien on this property, because no *scire facias* was issued and no notice given to the terre-tenant or occupiers. 2. That Wilson had a lien by virtue of his judgment, on other real estate of Beckwith to which he might resort for complete or partial satisfaction of his judgment, and ought not to come upon the fund in court, (which was the only security of Armstrong's creditors), for anything more than should be necessary to satisfy his judgment after he should have sold the property of Beckwith and applied the proceeds to his judgment.

The property to which the second objection referred, was a house and lot in Bellefonte, which John Rothrock sold and conveyed to Beckwith on the 12th February 1841, for the consideration of $1000, and which was, and still remained encumbered by a judgment against Rothrock, amounting on the 24th August 1842 to $143.12. This property would bring from $500 to $600 at a forced sale. These objections against the payment of Wilson's judgment out of the money in court for distribution, were urged on behalf of the judgment creditors of George S. Armstrong, whose judgments, entered at various dates from the 22d June 1840 to the 9th July 1842, were fully stated in the report of the auditor. Three of these judgments, to wit : those of T. Sharpless & Son, entered 22d June 1840, for $510.82, Welch, Carman & Co., entered 30th June 1840, for $536.08, Eckle, Spangler & Co., entered 18th July 1840, for $287.85, the total amount of which was $1334.75, were entered of record after the date of the articles of agreement between Beckwith and Armstrong and before the deed of conveyance in pursuance of the articles. The above judgment of Eckle, Spangler & Co., had been paid by Edward M'Garvy as special bail for Armstrong, and he claimed to be substituted as plaintiff, and to be paid out of the money in court : and to this also the other creditors objected. The property was sold on the judgment of the Bank of Middletown against Armstrong, entered of record the 28th July 1840, for $336.74, and Beckwith claimed that his mortgage, dated six days before the said judgment, should be paid out of the proceeds of the sale.

The court below were of opinion, that under the circumstances

of this case, the revival of the judgment of Wilson was sufficient to continue the lien and entitle him to payment of it out of the proceeds of sale: and that Edward M'Garvy having paid the amount of the judgment to Eckle, Spangler & Co., as the bail of Armstrong, was entitled to substitution, and that the judgment should be paid for his use. This opinion was the subject of the errors assigned.

*Hale*, for appellants, referred to the Acts of 1798 and 1827, requiring the revival of judgments, and pointing out the mode of bringing in terre-tenants; and argued, that the fact that the deed was not recorded did not affect the principle. There was possession under the deed, which the plaintiff was bound to know. 3 *Penn. Rep.* 229; 1 *Penn. Rep.* 71; 1 *Miles* 364; 1 *Watts* 33; 5 *Watts* 296: 3 *Watts & Serg.* 471. The bail for stay of execution does not stand in that equity towards the subsequent judgment creditors which will entitle him to substitution; that he was not originally bound as surety for the debt, but volunteered his responsibility, and that too for the purpose of preventing the collection of the debt, in relief of the subsequent judgment creditors, is a fatal objection to the claim. 1 *Penn. Rep.* 395; 2 *Brock.* 252; 3 *Watts & Serg.* 471.

*Burnside*, in support of the right of substitution, cited 3 *Leigh.* 272; 3 *Dess.* 214; 4 *Johns. Chan.* 29; 5 *Johns. Chan.* 315; 1 *Law Lib.* 2, 122, 150.

*M'Callister*, contra. Beckwith having remained in possession of the property, was the only person to whom notice could be given; for there was no notice, either legal or actual, of the alienation of the property. He, therefore, being a party to the amicable revival, had the only notice which could have been given if the proceeding to revive had been adverse, and with notice to terre-tenants generally. Besides, why should the creditors of Armstrong be permitted to complain of that which he himself would not? he had notice of the lien when he purchased, and had the funds in his hands for payment. 16 *Serg. & Rawle* 422; 17 *Serg. & Rawle* 123; 1 *Penn. Rep.* 72.

The opinion of the Court was delivered by

SERGEANT, J.—The supplementary Act of the 26th of March 1827, was enacted for the purpose of restraining the practices which had crept in under the Act of the 4th of April 1798, of constructive revivals of judgments by the issuing of execution, or by stay of execution, or of dispensing with revivals because the money was payable *in futuro*, or on a condition or contingency attached to a confession of the judgment, in all which cases it had been held by the court, or contended by counsel, that the lien would continue without issuing a *scire facias* within the five years. This Act also

[Armstrong's Appeal.]

altered the date from which the revival was to be reckoned, doing away the relation to the return day prescribed by the Act of 1798, as the time from which the five years were to commence. Another and most material object of the Act of 1827 was, to regulate revivals by the agreement of the parties, concerning which nothing had been said in the Act of 1798, but which had become a common usage. It therefore prescribes precise and positive provisions as to them, pointing out the mode in which they shall be authenticated, the parties competent to enter into them, and the time for which the lien shall, in that case, endure; and in the close of the third section directs, that no order or rule of court or other process or proceeding shall obviate the necessity of revival in the manner prescribed. It is obvious from comparing the two Acts together, that the Legislature intended to provide by express enactment, for every case that should occur, and to preclude thereafter interpretative and constructive revivals, and all other modes that should not conform to the precise directions of the Acts, in order that they might terminate the doubts and litigation that had arisen, and put liens by judgment on such a footing, that parties as well purchasers and others interested might have a clear and certain guide to follow in relation to their effect on real estate. It is the duty of the court to construe the Acts according to their obvious design. A departure from this would create again a host of questions for dispute, mischievous to the community, and calculated to subvert the wholesome end which was in view when the supplementary Act of 1827 was passed.

This Act enacts, as to revivals by agreement, that they shall be "by agreement of the parties and terre-tenants, filed in writing, and entered on the proper docket." That has not been done in the present case. The agreement of the 4th of June 1841, was signed only by Beckwith, the defendant in the prior judgment, and not by Armstrong, who had become the owner by a conveyance from Beckwith after that judgment, and whose creditors now contest the lien of this revival. But it is said, that Armstrong's deed was not recorded, and the plaintiff ought to be excused for not making him a party, because he had no means of knowing from the record of deeds, the existence of such a conveyance from Beckwith. The answer is, that he has chosen to risk this. If he meant to be secure at all events, he might have issued a *scire facias* within the five years, and had it served on Beckwith and also on the occupiers who were then in possession as tenants of Armstrong, and who, it is to be presumed, would have given him notice, because it was their duty to do so; but whether they would or not, such service is by the second section of the Act of 12th of April 1798, made an effectual service as far as regards the terre-tenants. The terre-tenant or owner at the time when a revival is sought, holding under a conveyance from the defendant, is the person most interested in the proceeding to obtain it, the defendant being

[Armstrong's Appeal.]

merely nominal, having parted with his interest. In the second section of the Act of 1798, the terre-tenant is the person first named on whom the writ is to be served, which shows that his connection with the revival was deemed of primary importance; and in the same spirit, by the Act of 1827, his consent in writing, together with that of the party, is made essential in a revival by agreement. Here neither Act has been complied with: the attempt to revive by agreement fails, for want of the parties required by the Act, and such failure is not to be dispensed with by the allegation of difficulties or apparent impracticabilities in discovering the owner, when they could have been avoided by resorting to the *scire facias*, in which every case is provided for that could occur, by service on terre-tenants or occupiers, or where there are no occupiers, and the defendant or his feoffees, their heirs, executors or administrators cannot be found, by proclamation in open court at two succeeding terms. We are, therefore, of opinion, that the lien of the judgment of 1841, not being duly revived, was lost, and that the expiration of the lien may be objected to by the lien creditors of the grantee, as well as by the grantee himself; and that in consequence of the expiration of such lien, the other judgment creditors, by the enactment of the second section of the Act of 4th of April 1798, have a priority for their liens.

The next question is, whether the bail for a stay of execution has a right to substitution? We have held in *Burns* v. *The Huntingdon Bank*, (1 *P. R.* 395), and *Pott* v. *Nathans*, (1·*Watts & Serg*. 155), that where the interposition of the bail is the means of hindering and delaying the payment of the debt, such bail has less equity than one who has been a prior surety. The principle of those cases is, that bail who intervenes in order to hinder execution, has no equity against other persons that may have been injured by the stay of execution. That principle seems to apply in the present instance. The purpose for which this bail was entered was to delay and postpone execution. This may have prevented a payment by the debtor or out of his funds. Substitution is a matter of benevolence and equity, and is sought, in this case, in order to acquire a preference. As between the bail and the principal debtor, there would, perhaps, be no difficulty: but regard is always had, in these questions, to third persons whose right may be affected by such substitution. In the case of *The Bank of the United States* v. *Winston's Executors*, (*Brockenbrough's Rep.* 254), where one had become bail to obtain a delay of execution under a special Act of Assembly, and asked substitution, C. J. MARSHALL suggested, that "the doctrine of subrogation or substitution was confined to sureties, and had never been applied to a mere volunteer. If an assignable instrument be transferred, its obligation at law and equity remains. If a security not assignable be discharged by a surety whom it binds, equity keeps it in force, and puts such surety in the place of the original creditor. But, I

think, there is no case in which this has been done in favour of a person not bound by the original security who discharges it as a volunteer. I will not say that it may not be done, but if it may, equity will consider all the circumstances and impose equitable terms." Considering that the substitution sought for in the present case will trench on the claims of the other judgment creditors, and that the bail are persons who came forward and procured a delay of proceedings in favour of the defendant, we think the substitution ought not to be admitted.

Decree reversed so far as respects the judgment of Wilson, and so far as it allows substitution to M'Garvy, and affirmed for the residue, and record remitted that distribution may be made accordingly.