## Lathrop and Dale's Appeal.

The Pittsburgh Bank having the first judgment against, and lien on, the real estate of Lewis Peterson, Peter Peterson, and James T. Kincaid, took in execution a tract of land, the individual property of Lewis Peterson, and sold it, whereby the judgment became satisfied. The Monongahela Navigation Company had the second judgment against, and lien, in the order of time, on the real estate of the two Petersons, but not against Kincaid or his estate. William Speer next had a judgment against, and lien on, the real estate of the two Petersons, but not against Kincaid or his estate. After these judgments, William Taylor obtained three judgments against the Petersons and Kincaid, in which Thomas F. Dale became bail for stay of execution, and as such paid the three judgments, after other judgments had been obtained against the two Petersons and Kincaid, and among the number was the judgment in favour of Sylvanus Lathrop for $4000, upon which the real estate of James Peterson, Peter Peterson, and James T. Kincaid, was taken in execution and sold, as also under a prior levy under the judgment of the Pittsburgh Bank. *Held,* first, that the Monongahela Navigation Company were entitled to be subrogated to the rights of the Pittsburgh Bank, and to have their judgments satisfied out of the moneys arising from the sale; and next, that William Speer was, upon a like principle, entitled to receive the residue of the money towards payment of his judgment. Secondly, that Thomas F. Dale had no right to be subrogated to the rights of the bank, so as to recover any portion of the money in preference to judgment creditors of the Petersons and Kincaid, though said judgments might be subsequent in point of time to Taylor's judgments.

THIS was an appeal by Sylvanus Lathrop and Thomas F. Dale from the decree of the District Court of Alleghany county, appropriating the moneys arising from a judicial sale of the real estate of Lewis Peterson, Peter Peterson, and James T. Kincaid.

It appeared, from the report of the auditor appointed to make distribution, that Lewis Peterson, Peter Peterson, and James T. Kincaid, were in business under the partnership names of L. and P. Peterson & Co., from the year 1826 till the 1st of January, 1840, at which time James T. Kincaid and Peter Peterson purchased the stock and continued the business, under the firm of James T. Kincaid & Co., until the 1st of January, 1842, when the latter firm was dissolved.

A number of judgments had been entered in the District Court against the former firm, composed of Lewis Peterson, Peter Peterson, and James T. Kincaid; and a number of judgments had also been entered in the same court against Peter Peterson, and against Lewis and Peter Peterson.

All the material facts in the case are fully and clearly stated in the opinion of the court.

*Metcalf,* for Sylvanus Lathrop, one of the appellants, cited 5 Watts and Serg. 230; 3 Watts & Serg. 404; 5 Watts & Serg. 352.

*Lowry*, for Thomas F. Dale, one of the appellants, cited 5 Watts & Serg. 356; 1 Penna. Rep. 398; 1 Watts & Serg. 157; 6 Watts & Serg. 199; 4 Randolph, Rep. 444; Theobald on Principal and Surety, 206; 10 Johns. Rep. 539, 546; Theobald on Principal and Surety, 235, 252; 17 Johns. Rep. 392; 6 Serg. & Rawle, 458; 16 Id. 252; 2 Rawle, 132; 2 Penna. Rep. 296, 378.

*Williams*, for the appellee, cited 17 Serg. & Rawle, 457, to show that a sale of the partnership property, under a judgment against one of the partners, was not good.

*Loomis*, for Sylvanus Lathrop, cited in reply 5 Watts, 230.

The opinion of the court was delivered by KENNEDY, J.

Appeal from the District Court of Alleghany county by Sylvanus Lathrop, a judgment and execution creditor of the Petersons and Kincaid; and also by Thomas F. Dale, who claims to be subrogated to the rights of William Taylor in those judgments obtained by him, the first on the 27th of December, 1841, and the second and third on the 3d of January, 1842, each for the sum of $274 84, in the District Court of Alleghany county, against Lewis Peterson, Peter Peterson, and James T. Kincaid, on the ground that he (Dale) had become bail for the defendants, in those judgments, for the purpose of giving to them the stay of execution allowed by the act of Assembly in such cases; and had, as such, paid the amount of the judgments, but not until after the judgments, for which a preference is claimed, were obtained.

The Bank of Pittsburgh had the first judgment and lien against Lewis Peterson, Peter Peterson, and James T. Kincaid, upon which they sued out an execution, took the separate real estate of Lewis Peterson, and by a sheriff's sale thereof made the amount of their judgments. The next judgment and lien, in the order of time, was had on the 23d of November, 1840, in favour of the Monongahela Navigation Company for $562 50, against Lewis and Peter Peterson, the plaintiffs, in which they claim to be subrogated to the rights of the Pittsburgh Bank under their satisfied judgment. Croker & Brothers appear to have the second judgment, in point of time, entered the 19th of March, 1841, for $93 35, against Lewis Peterson, Peter Peterson, and James T. Kincaid. And again, a third judgment was entered on the 1st of June, 1841, for $1497 93, in favour of William Speer, against Peter and Lewis Peterson. There were other judgments obtained against Lewis Peterson, Peter Peterson, and James T. Kincaid, of later date, in favour of different persons; and the judg-

ment in favour of Sylvanus Lathrop, under which the sale of the property was made, from which the money in question was raised, appears to have been the last judgment, and was entered on the 14th of July, 1842. William Speer claims the residue of the money in the court below, after satisfying the judgment in favour of the Monongahela Navigation Company; and as we think these two judgments are entitled to receive the money in this order, it is unnecessary to notice the other judgments more particularly. The judgment in favour of Croker & Brothers appears to have been altogether overlooked, but why, it is impossible to tell from the paper book. It may be that it is of a later date than that given to it in the paper book, and therefore could not come in for any portion of the money; but this is only conjecture. No appeal, however, is taken on account of it, which is sufficient to prevent our taking any notice of it. The money in court had been produced by a sale of two houses and lots ·of ground, which had been originally the private property of James T. Kincaid, but by an agreement made in writing, on the 1st day of January, 1842, between the said James T. Kincaid and Lewis and Peter Peterson, they became the common property of the three, and liable for the payment of the partnership debts contracted by them. These houses and lots were first levied on, with a tract of land, the private property of Lewis Peterson, under the judgment, at the suit of the Pittsburgh Bank, against Lewis Peterson, Peter Peterson, and James T. Kincaid, and condemned to be sold. The tract of land, however, yielding, by the sale made thereof, a sufficient sum of money to satisfy the debt coming to the bank on their judgment, the two houses and lots were not sold until afterwards, when they were levied on, under the judgment, in favour of Sylvanus Lathrop, and sold on or about the 20th of April, 1844, by virtue of a judicial process on both judgments.

Two questions seem to arise in this case. First, Will a subrogation of the Monongahela Navigation Company and William Speer, respectively, to the rights of the Pittsburgh Bank, entitle them to receive the money in court? That is, the Monongahela Navigation Company to receive first as much of it as will satisfy their judgment, and William Speer next the residue of it, towards satisfying his judgment, pro tanto? Secondly, Can Thomas F. Dale be subrogated to the rights of William Taylor, and thus become entitled to receive said money, or any portion thereof? The decree of subrogation is opposed, and sought to be reversed, on the ground that the Bank of Pittsburgh, having sued out execution on their judgment, and made the amount thereof, by a seizure and sale of the property of one of the defendants in it, have no right or claim under or by virtue of it, to which any

person can be subrogated, or from which any possible benefit can be derived; that the judgment, having become thus satisfied, has become extinct, and the same as if it never existed. It must be admitted, I think, that this doctrine has been established of late by the recent English cases. Lord Eldon, in Copis *v.* Middleton, 1 Turn. & Russ. 224, says, "It is a general rule that in equity a surety is entitled to the benefit of all the securities which the creditor has against the principal, but then the nature of those securities must be considered; when there is a bond merely, if an action was brought upon the bond, it would appear, upon oyer of the bond, that the debt was extinguished; the general rule, therefore, must be qualified by considering it to apply to such securities as continue to exist, and do not get back, upon payment, to the person of the principal debtor; in the case, for instance, where, in addition to the bond, there is a mortgage with a covenant on the part of the principal debtor to pay the money, the surety paying the money would be entitled to say, I have lost the benefit of the bond, but the creditor has a mortgage, and I have a right to the mortgaged estate, which has not got back to the debtor." As to the case of Hotham *v.* Stone, in note, 1 Turn. & Russ. 224, where Sir William Grant, the Master of the Rolls, decreed, that a surety in a bond, who paid the amount of it, had a right to come in as a specialty creditor, upon the estate of the principal debtor, which proved to be insufficient for the payment of the simple contract creditors, Lord Eldon observes, "I confess I am astonished to hear that it had been decided, that when there was merely a bond, and payment of the bond, without more, the surety was to be considered a specialty creditor." See also Hodgson *v.* Show, 3 Mylne & Keene, 183. And in Dowbiggen *v.* Bourne, 1 You. 111; S. C., 2 Youn. & Coll. 462, where the principal and surety gave to the creditor a joint and several promissory note, and the creditor brought separate actions against the principal and surety, and recovered judgment in both actions; and upon execution issued upon the judgment obtained against the surety, the surety paid the debt and costs; upon bill filed by the representatives of the surety, for the purpose of obtaining an assignment of the judgment which had been recovered against the principal debtor, it was held that the creditor having been paid his debt, the judgment was satisfied, and the creditor would not have been permitted to have proceeded upon it at law against the principal; and it not being available at law in his hands, neither could it be *available in equity* in the hands of the surety, and consequently the surety could not compel an assignment of it. The decision, in this last case, meets the first question in the case before us directly, and is an answer in the negative; that is, that the

Monongahela Navigation Company have no right to be subrogated to the place of the Pittsburgh Bank, because there is nothing to be gained by it, as the only security which the bank had for the payment of the debt owing to them was the judgment, which became extinct and of no force whatever, by the payment of it out of the property of Lewis Peterson. See 1 Story's Equity, sect. 499, b, and the note appended thereto (2) ; see also Pitman on Principal and Surety, where the cases mentioned above, and some others, are collected. I may here recite part of Mr. Shadwell's argument, as counsel in Copis v. Middleton, 1 Turn. & Russel, 224, as it accords with the view taken of the question in some of our own cases. He says, " Although the bond, when paid by the surety, is extinguished at law, yet the surety will be a specialty creditor, because a court of equity will keep alive the bond for his benefit, and, on the principle on which it interferes to prevent legal bars from being set up, will permit an action to be brought upon the bond, and restrain the principal from setting up the payment ;" whereupon Lord Eldon asked, " Did you ever hear of such an injunction ?" To which no reply was given.

We come now to what has been said and decided in our own courts on the question under consideration. In Fleming v. Beaver, 2 Rawle, 128, where H. and M. were sureties for P., and M. paid half the debt, and joined H. in confessing a judgment to a creditor of P.'s for the other half, it being agreed H. should pay this judgment; part of it, however, was paid by a levy on the personal property of M., and the residue he paid in cash. H.'s land being sold by an execution upon a judgment of later date, at the suit of another person against him, it was held, that M. had a right to receive the money in the sheriff's hands arising from the sale, in preference to the subsequent judgment creditor of H. This case was decided in 1828, and the Chief Justice, in delivering the opinion of the court, says, " actual payment discharges a judgment at law, but not in equity, if justice require the parties in interest to be restrained from alleging it, or insisting on their legal rights." In Burns v. The Huntingdon Bank, 1 Penna. Rep. 395, which was decided by this court in 1830, an endorser, against whom a judgment had been obtained by the bank for the amount of the note endorsed by him, where a separate judgment also had been obtained against the drawer, after being compelled to pay one-half the amount of the debt, the residue thereof having been paid by the bail of the drawer, who became bound for the payment of it, to procure a stay of execution after the entry of the judgment against him, was held entitled to be subrogated to the rights of the bank against the drawer, and also of the judgment against his bail, which had been obtained by the

bank, for the purpose of reimbursing him what he had paid as endorser. Again, in the same year, in Erb's Appeal, 2 Penna. Rep. 296, Mr. Justice Rogers, in delivering the opinion of the court, says, "If, then, Mary Moore has paid the judgment of Dearmond against *herself* and McCormick, she would have had a right to be subrogated, not only as respects the latter judgment, but the judgment of Martin *v.* McCormick. She would be entitled to all the rights and securities of the creditors." Thus showing, that in his opinion the circumstance of the surety being a co-defendant with the principal, in a judgment against them both, could not, upon his paying it, preclude him from being substituted, so as to have the benefit of it for the purpose of obtaining payment from the principal or out of his property. And in Croft *v.* Moore, 9 Watts, 451, it was held, that one of three sureties, in a judgment obtained against them, who paid the debt of their common creditor, was entitled to be subrogated to the rights of the creditor in the judgment so paid, to enable him to recover contribution from the other two. So, in Himes *v.* Keller, 3 Watts & Serg. 403, 404, Mr. Justice Sergeant, in pronouncing the opinion of the court, lays it down, that in courts of chancery the principle has been adopted, "that a surety in a bond or other security, paying it to the creditor, is entitled to a cession of the debt, and a substitution or subrogation to all the rights and actions of the creditor against the debtor; and the *security* is treated, as between the surety and debtor, as *still subsisting*." 1 Story's Equity, sect. 635. Mr. Justice Story, however, in what he says there, is rather speaking, as I take it, of the Roman law, and not particularly of the principle which had been adopted in courts of chancery.

From the foregoing cases it would appear, that we have adopted the general rule, that a surety by paying the debt of his principal becomes entitled to be subrogated to all the rights of the creditor, so as to have the benefit of all the securities which the creditor had for the payment of the debt, without any exception, as well those which became extinct, at law at least, by the act of the surety's paying the debt, as all collateral securities which the creditor held for the payment of it, which have not been considered as directly extinguished by the surety's paying the debt. Fleming *v.* Beaver was clearly a case where the surety had the benefit of a judgment against himself and the principal, which had been actually paid, and thus extinguished by him at law, for the purpose of recovering by means thereof, as if it had been a judgment still unpaid and in full force, the moneys which he had paid in discharge of it. Burns *v.* The Huntingdon Bank was not altogether the same, though approaching pretty near to it. The endorser there of a note, against whom the bank had obtained a judgment, being

compelled to pay it, was permitted to have the benefit of the judgment on the same note against the drawer, for the purpose of reimbursing himself, by means of it, what he had paid the bank in discharge thereof. But in Croft *v.* Moore, 9 Watts, 451, the same principle was adopted and acted on as in Fleming *v.* Beaver, where one of three sureties, in a joint judgment against them, having paid the amount of it, was subrogated to the rights of the plaintiff as creditor therein, for the purpose of obtaining, by means of it, contribution from his co-sureties and co-defendants in the same judgment, which, in fact, had been paid, and thereby extinguished, by him. These decisions have been made upon a supposed principle of equity, which, for the purpose of doing justice to the surety who has paid the debt, interposes to prevent the judgment, or security, which has been so extinguished at law, from being so considered as between the surety and the principal, or his subsequent lien creditors. And, indeed, I am strongly inclined to believe that this was the conclusion drawn by most of the profession, from the general terms in which the rule was laid down in some of the more early English authorities on the subject; where it is stated, without any qualification or exception, that the surety, who pays off the debt of his principle, for which he is bound, becomes entitled, in such case, to every security which the creditor had against the principal. See 1 Story's Equity, sect. 499, b. And had the courts of chancery acted upon this principle, and carried it out to the same extent that we have done here, there would have been nothing novel or strange in it: for it is found in the Roman law. Mr. Justice Story, (1 Story's Equity, sect. 500,) says, " not only is the surety, by that law, entitled, in such cases, to the benefit of all the collateral securities taken by the creditor, but he is also entitled to be substituted, as to the *very debt itself*, to the creditor, by way of cession or assignment. And upon such cession or assignment, upon payment of the debt by the surety, the debt is, in favour of the surety, treated, not as paid, but as sold; not as extinguished, but as transferred with all its original obligatory force against the principal." In this he appears to be sustained by 1 Domat. b. 3, sect. 6, art. 1, the words of which are, "He to whom a creditor makes over a debt is substituted to the right, and he acquires, together with the credit, the mortgage and privileges which are annexed to it, whether the assignment be made for a valuable consideration or *gratis*. For although it be true, that the *payment extinguishes the debt*, and that it seems, for that reason, that the creditor cannot transmit to another a right which is extinguished in his person by the payment; yet the assignment, which is made at the same time, has the same effect as if the creditor *had sold his right to him who pays him*. And, as to the

effect of the assignment, it is the same thing to him who pays for the debtor, whether it be the *person who is bound jointly with him for the debt* or *his surety*, or a third person." This doctrine, as Mr. Justice Story says, (1 Equity Jurisprudence, sect. 500,) stands, in substance, approved in all the countries which derive their jurisprudence from the civil laws; for which he refers, in the margin, to ample authority.

In regard to the second question, whether Thomas F. Dale can be substituted, and permitted to claim the money in court, under the judgments in favour of William Taylor, it seems to be well settled that he cannot, by several decisions of this court, in the cases of Burns *v.* the Huntingdon Bank, 1 Penna. Rep. 395; Patt *v.* Nathans, 1 Watts & Serg. 155, and Armstrong's Appeal, 5 Watts & Serg. 352. In this last case, the very point was decided, that one who becomes surety of a defendant in a judgment, to entitle him to a stay of execution, and by reason of such liability afterwards pays the judgment, is not entitled to be substituted as plaintiff, and have priority to subsequent judgment creditors. The judgment, therefore, in favour of Sylvanus Lathrop, if there were no others here, being for $4000, would be sufficient to bar all pretension of claim to the money in court on the part of Mr. Dale.

The decree of the court is therefore affirmed.