## Lloyd *et al. versus* Galbraith *et al.*

When a creditor has a lien on two funds in the hands of the same debtor, and another creditor has a lien upon only one of them, the first may be compelled in equity to levy his debt out of the fund to which the other cannot resort.

But this rule does not prevail except where both funds are in the hands of the common debtor of both creditors; or, if the funds belong to different persons, where the fund not taken is the one which in equity is primarily liable.

If one of several tracts of land, encumbered by a common lien, be aliened by the debtor, the tracts still remaining in him are, in equity, first liable to discharge the encumbrance.

In such case, a creditor having a lien upon all the tracts, and having levied on and sold those remaining in the debtor, a junior encumbrancer having a lien on those levied on, but not on the one previously aliened, is not entitled to subrogation as against the tract so aliened.

And it makes no difference, in such case, that the purchaser had not paid the whole of the purchase-money, if he had obtained the title.

Ebenhardt's Appeal, 8 *W. & S.* 327, affirmed.

Subrogation is not to be allowed except in a clear case, and where it works no injustice to the rights of others. It will never be decreed in favour of a subsequent lien-holder, not a surety, to the prejudice of intervening rights.

APPEAL IN EQUITY from the Common Pleas of *Indiana county*.

This was a bill in equity by William M. Lloyd, Robert B. Johnston, and William Jack, trading as Bell, Johnston, Jack & Co., against Archibald Galbraith, David Prosser, and the firm of Bell, Smith & Co., for a decree of subrogation. The defendants filed their answer, denying the complainants' right to the relief sought for; and the parties agreed upon the following statement of facts in the case:—

On the 26th May 1856, Alexander Elliott obtained a judgment against Archibald Galbraith for $1000.

At that date, Galbraith was the owner of a tract of land known as the "Swan Farm," situate in Rayne township; lot No. 13, in Chambersville; and a tract of land in Washington township, known as the "Anderson Farm;" and Elliott's judgment was a lien on all three.

On the 18th November 1856, Galbraith conveyed the "Swan Farm" to David Prosser, for the consideration of $3200.

On the 6th August 1856, Galbraith conveyed the "Anderson Farm" to Mitchell & Boyle; who, on the 3d of January 1857, reconveyed the same to said Archibald Galbraith.

On the 5th January 1857, two days after the reconveyance of the "Anderson Farm" from Mitchell & Boyle to Galbraith, Bell, Johnston, Jack & Co., obtained a judgment against Archibald Galbraith, for the sum of one thousand and thirty-four dollars and twenty-four cents. This judgment they allege was a lien on the

[Lloyd *et al. v.* Galbraith *et al.*]

" Anderson Farm," and on lot No. 13, but was not a lien on the " Swan Farm."

On the 25th December 1857, Alexander Elliott, upon a *vend. exponas* on his said judgment, sold the lot No. 13, in Chambersville, for $175, and the " Anderson Farm" for $780; the said Elliott, and Wm. M. Stewart, becoming the purchasers.

David Prosser gave Archibald Galbraith two notes for the unpaid purchase-money of the " Swan Farm," both dated 21st November 1856 (the date of Galbraith's deed to Prosser), one for $1000, payable 1st June 1857, and assigned to Bell, Smith & Co., on the 18th February 1857, upon which judgment was entered in the Common Pleas of Indiana to No. 275, December Term 1856, on the 18th March 1857; and the second for $1200, payable 1st June 1858, and assigned to Bell, Smith & Co. on the 19th February 1857, upon which judgment was also entered on the 18th March 1857, to No. 276, December Term 1856.

The first of these judgments, No. 275, was paid, the whole having been applied to the payment of judgments against Galbraith, which were liens on the land sold Prosser.

David Prosser paid into court the amount necessary to satisfy the judgment of Alexander Elliott aforesaid, with all costs, after deducting the sum for which the " Anderson Farm," and lot No. 13, were sold. And it was agreed, that this payment should have like effect as if Bell, Johnston, Jack & Co. had paid that sum into court for Elliott's use.

All the judgments, prior to that of Bell, Johnston, Jack & Co., had been paid, and the decree asked for was to be made only for the residue of judgment No. 276, December Term 1856, against David Prosser, still unpaid; and subject to any defence said Prosser might have against Archibald Galbraith, by reason of any failure in the quantity of land sold him by Galbraith, according to the terms of an agreement between them, dated the 21st November 1856.

It was alleged by complainants that they should be subrogated to the lien of Alexander Elliott against the Swan Farm, to the extent of the money realized by him out of the Anderson Farm, and lot No. 13, subject to the equities of Prosser aforesaid; and it was alleged by Bell, Smith & Co., that such subrogation would deprive them of the sum in Prosser's hands, due on said judgment No. 276, and therefore it should not be made.

The court below (BUFFINGTON, P. J.) dismissed the bill, with costs, and delivered the following opinion:—

" It is a familiar principle in chancery that where a creditor has a claim or lien on two funds in the hands of the same debtor, and another creditor has a lien on but one, upon the application of the latter, equity will compel the creditor on the double fund to levy his debt out of that fund, upon which the creditor upon the

[Lloyd *et al. v.* Galbraith *et al.*]

single fund cannot resort. It is upon this principle that the plaintiffs in this case invoke the aid of the court, and pray that we may subrogate them to the rights of Elliott, and authorize them to raise, through the Elliott judgment, an amount equal to what that judgment took out of the sale of the lands on which alone they had a lien. If the matter rested thus between the parties, and no legal rights or countervailing equities intervened, the court would so decree, and compel the joint creditor to select that fund that would result in complete justice to both.

" It is equally well settled, that where a creditor has a lien upon several pieces of property of the same debtor, and the debtor sells one or more of the pieces thus encumbered, equity will compel the creditor to levy, in the first place, upon the parts unsold, and if they do not suffice, then to resort to the pieces last disposed of, in the inverse order of the sales, before the parts first sold shall be liable. Upon this principle the defendants in this case resist the plaintiffs' bill, and insist that, as Prosser was a purchaser for value before the plaintiffs' judgment, Elliott was bound to levy his debt from the Anderson Farm and the lot, before resorting to the Swan Farm he had bought.

" Both the parties, therefore, plant themselves upon well established rules of equity ; and if there were no other difficulties interposing, the equity of Prosser, the purchaser, being prior in time, would be better in right.

" But how stands the case in regard to the position assumed by the plaintiffs ? On the 5th of January 1857, when their judgment was obtained, Galbraith was the owner of the Anderson Farm, and lot 13, but he was not the owner of the Swan Farm. That farm had passed into the hands of Prosser, who obtained the legal title on the 18th of November 1856. At that time, the Elliott judgment was a lien upon the whole, not only the Anderson Farm and lot, but the Swan Farm ; the Anderson Farm and lot still remaining the property of Galbraith, but the Swan Farm then being the property of Prosser. Does then the equitable principle, that the holder of a lien upon one fund compel the holder of a lien upon two funds to resort to that upon which he has no lien, apply, when one of the funds has ceased to be the property of the same debtor ? And will the equitable principle be carried so far, as to seize upon the legal estate of the purchaser, to reach even an unpaid balance of purchase-money still due to the debtor ? In Ex parte Kendall, cited in *Brightly* 162, it is said by Lord ELDON, ' this course takes place when both are creditors of the same person, and have demands against funds the property of the same person. But such seems not to be the rule, where the property sought to be affected are funds in the hands of different persons.' Equity, however, in applying this rule will look into the character of the respective debtors ; and if one of them against whom alone

[Lloyd *et al. v.* Galbraith *et al.*]

a lien exists is the mere surety of another against whom there is a joint lien, equity will compel the whole of the joint lien to be levied from the funds of the real debtor, so as to leave the fund in the hands of the surety to be applied to the payment of his creditors.

" In the present case, it is sought to compel Elliott to levy his debt from the funds in the hands of Prosser (or which is the same thing, to subrogate to Elliott's right), and leave the funds still remaining in the hands of Galbraith, liable to the charge or judgment of Bell, Johnston & Co. And, certainly, this would be done, if Galbraith was the mere surety of Prosser, or stood in such a relation that equity would consider the fund in the hands of Prosser as primarily responsible for the payment of Elliott's debt. Prosser holds the legal title; has actually paid a large portion of the purchase-money; and the fund now in dispute is the balance unpaid, secured by bond and judgment. It is not sought to be reached by attachment, for the reason, it is probable, that it has passed out of Galbraith's hands; but, by keeping alive the Elliott judgment for the benefit of Bell, Johnston & Co. Suppose that is done: what then? They will issue and levy upon the land in the hands of Prosser, held by the legal title. But he had not paid the whole of the purchase-money; and it is said that, if the fund in his hands has to meet the Elliott judgment, the court will relieve him by opening the judgment for the balance of the purchase-money. But suppose the court of law, where the judgment is rendered, would refuse to open it; what then? He is driven into chancery upon a bill for an injunction. This might do in the present case, as this bill is before the same court where the judgment is. If it was a different court, greater perplexity might ensue. Would a chancellor then decree that an estate in the hands of a *bonâ fide* purchaser, who bought upon the faith that the vendor had abundant means to meet all debts of record, should be liable to subsequent judgments, when the effect must be to annoy him with suits in law and equity to rid himself of the securities outstanding for the balance of the purchase-money?

" For these reasons, I very much doubt, whether a chancellor would permit a subsequent judgment-creditor, in this indirect way, to reach an estate in the hands of a *bonâ fide* holder who had obtained the legal title, although there might be a balance of purchase-money still due by bond, judgment, or mortgage, in the hands of the vendee. The law of this state especially encourages honest purchasers, and discountenances secret and unforeseen liens.

" Be this, however, as it may, Bell, Johnston & Co., after the entry of their judgment on the 5th of January 1857, made no effort, which they might have done by bill in chancery, to shove the Elliott judgment on to the Swan tract, but acquiesced in the

[Lloyd *et al. v.* Galbraith *et al.*]

situation of affairs as they stood, until the 19th February 1857, when the bonds of Prosser, for the residue of the purchase-money, were assigned to Bell, Smith & Co., and judgments were entered by them on the 19th March 1857. These assignments, we are to understand, were for a full and valuable consideration, and *bonâ fide*, as the facts agreed upon do not state otherwise. Those bonds then were abundantly safe as the record stood. Prosser was good for the money; and the unpaid liens, except the Elliott one, were of trifling importance. Bell, Johnston & Co.'s judgment was no lien; and the Elliott judgment was the oldest lien upon the balance of Galbraith's estate. Bell, Johnston & Co. had done nothing to indicate an intention to push the Elliott judgment on to the Swan Farm, which, if done, might have been notice upon the principle of *lis pendens*. In this situation, with the record all clear and satisfactory, and nothing seemingly in the way of an abundant security, and no actual notice of an intended effort to change the relation of things as they stood, Bell, Smith & Co. expended their money in the purchase of these securities. Would it not be inequitable to push them aside now in favour of one who, by taking his lien on the residue of the estate of Galbraith, and giving no notice of his intention to pursue other than the ordinary course to raise his money, should by this indirect mode of subrogation, push aside those *bonâ fide* purchasers of legal securities, and sweep the fund away from them? In a case where the assignee of a bond had, before taking the assignment, called on the debtor and received assurance that the money was justly due, and took the bond on the faith of that assurance, the debtor would be stopped from disputing it; and if equity would, under such circumstances, subrogate, the debtor would be compelled to pay the money twice. The only case referred to that seems to conflict with this view is Hasting's Case, 10 *Watts* 303, where it is determined, that the equities are to be adjusted as they existed at the time the lien of the creditor who seeks the aid of the court, was entered. That, however, was a case where all the funds had been converted into cash, and distribution decreed.

"Upon the whole case, although by no means confident of my correctness, I have arrived at the conclusion that the equity of Bell, Smith & Co. is superior to that of Bell, Johnston & Co., and refuse subrogation."

From this decree the present appeal was taken.

*Whites & Coffey*, for the appellants, cited Alston *v.* Munford, 1 *Brock.* 266; Ramsey's Appeal, 2 *Watts* 232; Ex parte Kendall, 17 *Ves.* 519; Gearhart *v.* Jordan, 1 *Jones* 331; Dunn *v.* Olney, 2 *Harris* 220; Neff *v.* Miller, 8 *Barr* 349; Morris *v.* Olwine, 10 *Harris* 441; Cottrell's Appeal, 11 *Id.* 295; James *v.* Hubbard, 1 *Paige* 228; Hasting's Case, 10 *Watts* 303.

[Lloyd *et al. v.* Galbraith *et al.*]

*Stewart* and *Foster*, for the appellees, cited *Brightly's Eq.*, § 185; 4 *Harris* 448; 2 *Watts* 206, 232; 3 *Id.* 437; 2 *Id.* 280.

The opinion of the court was delivered by

STRONG, J.—This case was rightly decided by the learned judge of the Court of Common Pleas. If at the time when Elliott proceeded to enforce payment of his judgment, by the sale of the lot and of the Anderson Farm, he could have been compelled in equity to levy upon the Swan Farm, which Prosser had purchased, then the appellants, whose security upon that lot and the Anderson Farm was taken away by his execution, would be entitled to substitution to his place and to the use of his judgment. The acknowledged principle is, that when a creditor has a lien on two funds in the hands of the same debtor, and another creditor has a lien upon only one of the funds, the first may be compelled in equity to levy his debt out of the fund to which the other cannot resort. This rule, however, has never prevailed except in cases where both funds were in the hands of the common debtor of both creditors. In Ex parte Kendall, 17 *Ves.* 514, Lord ELDON stated it thus: "We have gone this length; if A. has a right to go upon two funds, and B. upon one, having both the same debtor, A. shall take payment from that fund to which he can resort exclusively; that by those means of distribution both may be paid. That course takes place where both are creditors of the same person, *and have demands against funds the property of the same person.*" Subrogation may indeed be admitted in some cases where the two funds belong to different persons, if the fund not taken be the one which in equity is primarily liable. Thus, where one creditor has a judgment against principal and surety, and another has a judgment against the surety alone. If, in such a case, the creditor of the two collect his debt from the surety, the other creditor is entitled to the use of his judgment against the principal: Gearhart *v.* Jordan, 1 *Jones* 325. There are other instances than the one I have given. In them all, however, the equity of the second creditor is precisely that of the debtor, and is worked out through the equity of the debtor: Ex parte Kendall, *ut supra.* Now it is clear, that when Elliott issued his execution he was under no obligation to levy it first upon the Swan Farm. On the contrary, a chancellor would have compelled him, at the suit of Prosser, to obtain satisfaction in the first instance out of the lands which his debtor had not sold. Prosser had bought the Swan Farm, and therefore the remaining property of the debtor was primarily liable for the debt due to Elliott. The rule firmly established in this state is, that if one of several tracts of land, encumbered by a common lien, be aliened by the debtor, the tracts still remaining in him are in equity first liable to discharge the encumbrance: Nailer *v.* Stanley, 10 *S. & R.* 450; Cowden's Estate, 1 *Barr* 267.

[*Lloyd et al. v. Galbraith et al.*]

This was an equity existing in Prosser before the recovery of the judgment of the appellants.    The case, therefore, shows that when Elliott's execution was issued, and when Bell, Johnston, Jack & Co. obtained their judgment, there were not two funds belonging to the same debtor upon which the execution could be levied.    Not only did the funds not belong to the same debtor, but one of them was exempt from seizure, until that to which alone the appellants could look, had been exhausted.    The rule then, upon which they rely in urging their claim to subrogation, is inapplicable to this case.    Nor was Galbraith, the debtor, a surety, having, as such, a right to insist that Prosser, as his principal, should pay the debt due to Elliott.    The land which he had sold was not in equity primarily liable to discharge the lien upon all the property of the vendor, but only secondarily.    Galbraith having had no equity to compel Elliott to resort to it, the appellants, whose equity in such a case must be worked out through that of their debtor, are equally without remedy.

Nor is their condition bettered by the fact, that Prosser had not paid all the purchase-money of the Swan Farm.    He had obtained the title, had paid a large portion of the contract price, and had given his notes for the remainder.    One of these he had paid, and the other was not payable until some months after Elliott enforced satisfaction of his judgment by the sale of the lot and the Anderson Farm.    Upon this unpaid note, Elliott had no lien, and it was in no sense responsible for the payment of Galbraith's debt to Elliott.    If reached at all by him, it could only have been by attachment-execution, before its assignment to Bell, Smith & Co., or indirectly by a levy upon the land, which, as has been seen, Prosser had an equity to prevent, until the other funds of Galbraith should be exhausted.    Moreover, Elliott was under no obligation to resort to an attachment, for the debt due from Prosser to Galbraith was not then payable, and neither Galbraith nor any subsequent creditor could insist that he should be delayed.    After all, notwithstanding the purchase-money had not all been paid, it was still a fund in the hands of one who was not the debtor of the appellants, differing from the land only in the mode by which it could be taken in execution.    Ebenhardt's Appeal, 8 *W. & S.* 327, bears a very strong resemblance to this case.    There, as here, a creditor obtained a judgment which was a lien on three several tracts of land.    The debtor then sold one of them, and took a note from the purchaser for a part of the purchase-money.    Upon this note the debtor endorsed a direction to pay the amount of it on the lien of the judgment so recovered.    Subsequently, other creditors recovered judgments against the debtor, which became liens on the two tracts of land remaining unsold.    These two tracts were then sold under the first judgment, and the proceeds applied to its payment, paying it in full.    The junior judgment-creditors

[Lloyd *et al. v.* Galbraith *et al.*]

then applied to be subrogated to the rights of the first judgment-creditor. The court below decreed the subrogation so far as to allow them to collect a sum equal to the unpaid purchase-money of the tract sold by the debtor. This court, however, reversed the decree, and held that there was no right to subrogation. It is difficult to distinguish that case from the present.

There is another view which strengthens the position of the appellees. Subrogation is not to be allowed except in a clear case, and where it works no injustice to the rights of others: Erb's Appeal, 2 *Penn.* 296; Goswiler's Estate, 3 *Id.* 200; Himes *v.* Keller, 3 *W. & S.* 401; McGinnis's Appeal, 4 *Harris* 445. Now in this case, to say nothing of the fact that judgment was recovered against Prosser upon his note, and of the difficulty of his ridding himself of the judgment in case of his being compelled to pay on account of the Elliott judgment, the record reveals that Bell, Smith & Co. had become the purchasers of the note before Elliott levied upon the lot and the Anderson Farm. Substitution cannot be decreed, except at the expense of Bell, Smith & Co. But the rule is, that it will never be decreed in favour of a subsequent lien-holder, not a surety, to the prejudice of intervening rights. Even one who becomes surety of a defendant in a judgment to entitle him to a stay of execution, and who afterwards pays the judgment, is not entitled to a cession of the judgment so as to have priority to judgment-creditors subsequent to his assumption of suretyship, and prior to his judgment: Armstrong's Appeal, 5 *W. & S.* 352; 1 *Barr* 512. But it is said the equity of the appellants is prior in time to that of Bell, Smith & Co., inasmuch as their judgment was entered before the latter purchased the note of Prosser, and for this Hasting's Case, 10 *Watts* 303, is cited. That is not, however, the matter decided in that case. However that may be, the lien of their judgment gave them no equity against Prosser's land, as we have already shown, and certainly no claim against his note, even if it had remained in the hands of Galbraith. But I am unable to perceive how, in any event, an equitable right could exist in them until the land bound by the lien of their judgment was swept away by the older lien, and if not, then the rights acquired by Bell, Smith & Co. before that time cannot be taken away by subrogation.

The decree of the Court of Common Pleas is affirmed.